### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
GAIL LYNNE SHEFCYK           :    Civil No. 3:14CV00619 (HBF)
                             :
v.                           :
                             :
CAROLYN W. COLVIN, ACTING    :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION               :    October 26, 2016
                             :
-----------------------------x
```

<u>**RECOMMENDED RULING ON CROSS MOTIONS**</u>

Plaintiff Gail Lynne Shefcyk brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security which denied her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §401 <u>et seq</u>. ("the Act"). Plaintiff has moved to reverse or remand the case for a rehearing. The Commissioner has moved to affirm.

For the reasons set forth below, plaintiff's Motion to Reverse or Remand **[Doc. #11]** is **DENIED.** Defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #13]** is **GRANTED.**

## I. ADMINISTRATIVE PROCEEDINGS

The procedural history of this case is not disputed. Plaintiff filed an application for DIB on January 8, 2010,

alleging disability as of July 5, 2008.[1] [Certified Transcript of the Record, Compiled on June 25, 2014, Doc. #8 (hereinafter "Tr.") 122-28; 144]. Plaintiff alleged disability due to colitis, diabetes, arthritis, gastroesophageal reflux disease ("GERD"), hiatal hernia, endometriosis, and low back pain. [Tr. 129; 148].

The procedural history of this case was outlined by the Court in a Recommended Ruling dated March 26, 2013, and is not disputed. Shefyck v. Astrue, Civ. No. 11-CV-01687(WWE) (D. Conn. Mar. 26, 2013) [Civ. No. 11-CV-01687(WWE) Doc. #19; Tr. 824-68]].[2] In granting plaintiff's motion in part, the Court remanded to the Commissioner finding,

> Substantial evidence [did] not support the ALJ's credibility determination as to plaintiff's fibromyalgia and ... remanded for reconsideration. On remand, the ALJ should make specific findings as to the weight given to plaintiff's reported pain and any functional limitations caused by her fibromyalgia. The Court also note[d] that the ALJ failed to acknowledge the opinion of Dr. Guarnaccia, the consultative examiner. On remand, the ALJ should make specific findings regarding the effect of Dr. Guarnaccia's report on plaintiff's RFC.

[Tr. 867].[3]

On July 10. 2013, the Appeals Council remanded the case to

---

[1] Plaintiff's last date insured is September 30, 2012. [Tr. 144].
[2] The Recommended Ruling was affirmed and adopted over objection on April 26, 2013. Judgment entered on April 26, 2013. [Doc. #29]
[3] In light of the Court's credibility finding, it did not reach the other issues raised in plaintiff's motion. [Tr. 867].

the Office of Disability Adjudication and Review in Hartford for a new hearing, decision and order. [Tr. 869-71].  On November 20, 2013, ALJ Ryan A. Alger held a hearing at which plaintiff appeared with an attorney and testified. [Tr. 777-803]. On February 7, 2014, the ALJ found that plaintiff was not disabled, and denied her claim. [Tr. 751-69].

Plaintiff, represented by counsel, timely filed this action for review and moves to reverse the Commissioner's decision.

## II.   STANDARD OF REVIEW

The review of a social security disability determination involves two levels of inquiry. First, the Court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the Court must decide whether the determination is supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983) (citation omitted).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's

conclusion – if the Court determines that the ALJ failed to apply the law correctly. See Norman v. Astrue, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence."). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (alteration added) (citation omitted). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citation omitted). "Moreover, when a finding is potentially dispositive on the issue of disability,

4

there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding." Johnston v. Colvin, Civil Action No. 3:13-CV-00073(JCH), 2014 WL 1304715, at *6 (D. Conn. Mar. 31, 2014) (internal citations omitted).

It is important to note that, in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (citations and internal quotation marks omitted). "[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013)(citations omitted).

## III. SSA LEGAL STANDARD

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.

To be considered disabled under the Act and therefore entitled to benefits, Ms. Shefcyk must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); see also 20 C.F.R. §404.1520(c)(requiring that the impairment "significantly limit [ ] ... physical or mental ability to do basic work activities" to be considered "severe").

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520(a)(4). In the Second Circuit, the test is described as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). If and only if the claimant does not have a listed

impairment, the Commissioner engages in the fourth and fifth steps:

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the Secretary must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity." Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243 (2d Cir. 2010) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003)); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from his physical and mental impairments. See 20 C.F.R. §§404.1545(a), 416.945(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978) (citation omitted). "[E]ligibility for benefits is to be determined in light of the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." Id. (citation and internal quotation marks omitted).

## IV.  THE ALJ'S DECISION

Following the above-described five step evaluation process, ALJ Alger concluded that plaintiff was not disabled under the Social Security Act. [Tr. 754-69]. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 5, 2008, the alleged disability onset date. [Tr. 757].

At step two, the ALJ found that plaintiff had the severe medical impairments of fibromyalgia, irritable bowel syndrome, osteoarthritis of the right knee, degenerative disc disease of the cervical and lumbar spine, and obesity. [Tr. 757]. The ALJ found that plaintiff's diabetes mellitus, mild hepatomegaly and left carpal tunnel release were nonsevere impairments. [Tr. 757].

At step three, the ALJ found that plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt.

8

404, Subpart P, Appendix 1. [Tr. 759]. The ALJ specifically considered Listings 1.00 (musculoskeletal systems), 1.02 (major dysfunction of joint), 1.04 (disorders of the spine), and 5.06 (inflammatory bowel disease); evaluated plaintiff's fibromyalgia under Social Security Ruling ("SSR") 12-2p and her obesity under SSR 02-1p. [Tr. 759-60].

Before moving on to step four, the ALJ found plaintiff had the RFC to perform a full range of sedentary work with no additional limitations. [Tr. 760].

At step four, the ALJ found plaintiff capable of performing her past relevant work as a loan officer and concluded that plaintiff was not disabled "at any time from July 5, 2008, the alleged onset date, through September 30, 2012, the date last insured." [Tr. 768-69].

V.   **DISCUSSION**

On appeal, plaintiff asserts the following arguments in favor of remand.

1.   The ALJ's evaluation of plaintiff's fibromyalgia remains inadequate;

2.   The ALJ's evaluation of the medical evidence is flawed;

3.   The ALJ did not adequately evaluate plaintiff's obesity;

4.   The ALJ did not properly weigh medical opinion; and

5.    The ALJ's functional capacity assessment is flawed.

**A.    Step Three**

  **1.    Fibromyalgia**

Plaintiff challenges the ALJ's findings at step three, arguing that his evaluation of her fibromyalgia was inadequate. [Doc. #11-1 at 14-17]. At step three, an applicant is required to identify a particular listing under which she may qualify. "For a claimant to show that his impairment matches a listing, it must meet <u>all</u> of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in original). Plaintiff bears the burden of proof at step three. <u>Talavera</u>, 697 F.3d at 151.

Defendant argues that the ALJ properly evaluated plaintiff's fibromyalgia pursuant to SSR 12-2p and "the evidence of fibromyalgia is not persuasive." [Doc. #13-1 at 4; Tr. 760].

At step three, the ALJ found that plaintiff's fibromyalgia did not medically equal a listed impairment alone or in combination with at least one other medically determinable impairment. [Tr. 760]. The ALJ further stated that "[n]o acceptable medical source, including the State Agency medical consultants, found that the claimant's fibromyalgia medically equaled a listed impairment." [Tr. 760]. The Court agrees. Plaintiff has not shown at step three that her fibromyalgia meets or equals a medically determinable impairment. As set

forth below, the bulk of the analysis on this appeal is focused on the objective and subjective evidence supporting the ALJ's findings regarding plaintiff's functional abilities and whether it precludes her from performing any substantial gainful activity. See SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996); Hawkins v. First Union Corporation Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) (recognizing that the amount of pain and fatigue caused by fibromyalgia remains subjective). "The severity regulation requires the claimant to show that she has an 'impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities.'" Ortiz v. Colvin, No. 3:13CV610 (JGM), 2014 WL 819960, at *10 (D. Conn. Mar. 3, 2014) (quoting 20 C.F.R. §§404.1520(c), 416.920(c), citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)). These challenges will be addressed below.

The Court finds that there is substantial evidence to support the ALJ's step three findings as to fibromyalgia.

### 2.  Diabetes

The Court next addresses plaintiff's claim that "the ALJ is surely incorrect when he states that 'examinations consistently revealed no hyper or hypoglycemia.'" [Doc. #11-1 at 18; citing Tr. 757]. However, plaintiff has isolated this quote from a longer analysis of the medical evidence at pages 757-58 of the ALJ's opinion. Specifically, this passage is found in the

context of the ALJ providing support in the record for
concluding at step three that plaintiff's diabetes is a
nonsevere impairment. [Tr. 757-58]. The ALJ concluded that
"substantial medical evidence documented no secondary effects
from the claimant's diabetes, and no end organ damage. (Ex.
35F). Two State Agency medical consultants reviewed the evidence
of record and opined that the claimant's diabetes was nonsevere.
(Ex. 13F, 15F)" [Tr. 758].  There is no dispute that plaintiff
is a diabetic or that her A1C readings placed her in the
diabetic range. See Stip. of Facts Doc. #15 at n. 22. Rather,
the relevant question is whether the ALJ's finding that her
diabetic condition was nonsevere is supported by substantial
evidence of record. The Court finds there is. The ALJ
specifically referenced treatment records from 2008 through 2012
to support his step three finding. [Tr. 757-58; Stip. of Facts,
Doc. #15 (citing Tr. 473-74 (noting poor control of blood sugar
levels due to stopping diabetes medications); Tr. 470, 639
(prednisone may have negatively impacted blood sugar levels);
Tr. 645 ("no symptoms of hyper or hypoglycemia."); Tr. 630
("Sugars have been improving" and "[d]iscussed exercise as a way
to control sugars better."); Tr. 577 (noting stable blood sugar
control); Tr. 580 (noting plaintiff reported no hypoglycemic
episodes); Tr. 1095, 1098 (noting noncompliance with monitoring
blood sugar, diet and diabetes medication); Tr. 1236 ("no known

diabetic complications" "currently asymptomatic"); Tr. 1231
(noting no diabetic complications, currently asymptomatic,
stable since visit, reporting sugars under "much better control"
and she denied polyuria or hypoglycemia); Tr. 1226-30 (reporting
"stress eating", stating "diabetes and lipids although improved
... are not at goal ...may be secondary to dietary
indiscretion.")].

The record contains substantial evidence to support the
ALJ's finding that plaintiff's diabetes is a nonsevere
impairment. See Bonet ex rel. T.B., 523 F. App'x at 59
("[W]hether there is substantial evidence supporting the
appellant's view is not the question here; rather, we must
decide whether substantial evidence supports the ALJ's
decision.") (citations omitted)); Johnson v. Astrue, 563 F.
Supp. 2d 444, 454 (S.D.N.Y. 2008) ("If the reviewing court finds
substantial evidence to support the Commissioner's final
decision, that decision must be upheld, even if substantial
evidence supporting the claimant's position also exists.").

Plaintiff did not challenge this step three finding on
severity, beyond this remark and the additional statement that
"consistent reporting of diabetes throughout the Record adds
credibility to the plaintiff's claim of constant fatigue, a well
known symptom of Type II diabetes." [Doc. #11-1 at 18]. The
Court will address the ALJ's credibility determination later in

this opinion.

Accordingly, the Court finds no reversible error with respect to the ALJ's step three analysis of plaintiff's diabetes.

### B.    Evaluation of Medical Evidence

Plaintiff next argues that the ALJ's evaluation of the objective medical evidence is flawed. [Doc. #11-1 at 17-21].

### 1.    Gastroenterology

Plaintiff first argues that the ALJ's statement that "the claimant did not seek treatment from [her gastroenterologist] Dr. Opalacz after 2010" is not supported by the record. [Doc. #11-1 at 17; Tr. 767]. The Court agrees but finds the ALJ's error is harmless. Dr. Opalacz, of Middlesex Gastroenterology Associates, began a treatment relationship with plaintiff in July 2006 [Tr. 463-64] through August 2010. [Tr. 1034]. After a gap in treatment of more than two years, Dr. Opalacz next treated plaintiff on December 12, 2012 for an evaluation of rectal bleeding, colitis and screening [Tr. 1207]. He performed a colonoscopy with surveillance biopsy on December 17, 2012 [Tr. 1185-86; 1280-81], noting a normal appearing colon with internal hemorrhoids. Id. Biopsies "showed no significant pathological change" and "[t]here was no evidence of active inflammatory bowel disease or collagenous or lymphocytic colitis." [Tr. 1278].

14

Plaintiff contends that the ALJ failed to examine and remark on the continued flare-ups of irritable bowel syndrome, abdominal pain and bowel movement urgency/frequency with occasional diarrhea, colitis and rectal bleeding. [Doc. #11-1 at 18]. However, the ALJ found that "the record documents a history of irritable bowel syndrome, which stabilized with treatment and does not support greater limitations than articulated in the residual functional capacity." [Tr. 763]. The ALJ summarized Dr. Opalacz's treatment records from August 2008 through August 2010 to support this finding. [Tr. 763-64]. It is accurate that plaintiff was seen on four other occasions at Middlesex Gastroenterology Associates, by Michael McDonald, Certified Physician's Assistant ("PA-C"), once in 2001 [Tr. 1192-95 (10/4/10 noting abdominal cramping likely bacterial overgrowth due to multiple antibiotic treatments)] and on three occasions in 2012. [Tr. 1196-99 (2/23/12 "I believe this is an IBS exacerbation"); 1200-02 (6/28/12 noting improvement of "stomach issues" on Endocort); 1203-06 (11/3/12 referred to Dr. Opalacz for a colonoscopy to rule out "IBD vs. Microscopic exacerbation.")]. However, these records provide further support for the ALJ's conclusion that occasional flare-ups of IBS responded to treatment and did not support greater RFC limitations.

"Failure to address evidence is harmless error if

15

consideration of the evidence would not have changed the ALJ's ultimate conclusion." McKinstry v. Astrue, No. 5:10-CV-319, 2012 WL 619112, at *5 (D. Vt. Feb. 23, 2012), aff'd, 511 F. App'x 110 (2d Cir. 2013) (citing Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (finding harmless error where "we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that Petitioner was not disabled during the closed period."); Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.")).

Accordingly, the Court finds no error in the ALJ's assessment of the treatment records from plaintiff's gastroenterologist Dr. Opalacz and physician's assistant McDonald.

### 2.    Orthopedic

Plaintiff also challenges the ALJ evaluation of plaintiff's degenerative disc disease. She argues that "despite repeated MRI examinations of the lumbosacral spine in 2008, 2010 and 2013, all of which demonstrated bulging discs and neural foraminal stenosis ranging from mild to moderate (TR 714, 33[8], 1396), the ALJ on no discernible basis dismisses them as revealing 'primarily mild degenerative disc disease.' (TR at 759, 761)."

[Doc. #11-1 at 21]. The Court disagrees.

Plaintiff provides a selective reading of the ALJ's analysis of the medical record. At page 759 of the ALJ's decision he states,

> Diagnostic testing confirmed mild lumbar and cervical degenerative disc disease, but no significant central or neuroforaminal stenosis within the cervical spine. X-ray of the cervical spine in October of 2008 revealed foraminal narrowing at C3-C4 on the right, but patent foramen on the left and good maintenance of disc space. M.R.I. confirmed no significant central or neuoforaminal stenosis within the cervical spine. X-ray of the lumbar spine revealed only mild narrowing at the L5-S1 disc space with associated foraminal narrowing. M.R.I. confirmed a broad-based disc bulge resulting in moderate right and mild to moderate left neuroforaminal stenosis. M.R.I of the lumbar spine in February of 2010 documented no change from the 2008 study, and confirmed only mild degenerative disc disease

[Tr. 759]. This is an accurate summary of the evidence and is not challenged by plaintiff. Similarly, the ALJ states at page 761 of his ruling that "[m]edical evidence of record supports the ability of the claimant to perform work at the sedentary exertional level, with no additional limitations. Diagnostic testing revealed primarily mild degenerative disc disease." [Tr. 761]. The ALJ then summarized the orthopedic treatment records from October 2008 through February 2010. [Tr. 761-62]. Plaintiff does not challenge the summary of this medical evidence either. The ALJ accurately noted that plaintiff did not return to her orthopedic provider in 2011 or 2012. [Tr. 762]; see SSR 96-7p,

1996 WL 374186, at *7 (S.S.A. July 2, 1996) ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.").

After her date last insured, plaintiff returned to her orthopedist Dr. Bash on April 10, 2013; the doctor noted, "[W]e have not seen her in approximately over three years. She states about a month ago she started having low back pain and right leg pain. The pain is severe." [Tr. 1395 (emphasis added)]. Plaintiff does not challenge the ALJ's summary of this treatment record; the break in treatment with an orthopedist for several years; or the fact that her back pain became symptomatic in March/April 2013, after the date last insured. [Tr. 762]. A MRI dated April 22, 2013, found that "[a]t L5-S1, there is a broad based central disc protrusion with effacement of the thecal sac and mild right greater than left bilateral neural foraminal narrowing." [Tr. 1396]. On examination, Dr. Bash found plaintiff

> in no acute distress. Ambulates without assistive
> device. Motor strength is manual testing C5-T1, L1-S1,
> 5/5 strength all groups. Reflexes are 2+ in the upper
> and lower extremities. No long tract signs or
> pathological reflexes. Straight leg raising is
> positive on the left hand side. No atrophy or sensory
> deficits in the upper extremities or lower

18

> extremities. Painless range of motion of the hips,
> knees, upper extremities or lower extremities. Range
> of motion: Forward flexes to about 90 degrees,
> extension 10 degrees, axial rotation 5 degrees
> bilaterally. Pulses are 2+ distally in the feet. No
> evidence of thrombophlebitis or DVT. Abdominal
> examination is benign. No significant scoliosis or
> kyphosis is noted. There is no tenderness at the
> sciatic notches. There is no localized tenderness or
> swelling in the upper extremities. The skin is intact.
> The patient is fully neurovascularly intact.

[Tr. 1395]. Plaintiff's argument that the ALJ's evaluation of

the medical evidence is flawed is not supported by the record

       The Court finds no error in the ALJ's evaluation and review

of plaintiff's orthopedic treatment records and testing and

concludes that the ALJ's findings are based on substantial

evidence.

       **C.    Credibility Determination**

       Plaintiff next argues that the ALJ erred in his credibility

determination. [Doc. #11-1 at 18-21]. The ALJ is required to

assess the credibility of the plaintiff's subjective complaints.

See generally 20 C.F.R. §404.1529. The courts of the Second

Circuit prescribe a two-step process. First, the ALJ must

determine whether the record demonstrates that the plaintiff

possesses a medically determinable impairment that could

reasonably produce the alleged symptoms. 20 C.F.R. §404.1529(b).

Second, the ALJ must assess the credibility of the plaintiff's

complaints regarding the intensity of the symptoms. 20 C.F.R.

§404.1529(c). To do this, the ALJ must determine if objective

                                    19

evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors laid out at 20 C.F.R. §404.1529(c). See Skillman v. Astrue, No. 08CV6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010). These factors include: "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; and (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain." Id. (citations omitted). The ALJ must consider all the evidence in the case record. SSR 96-7p, 1996 WL 374186, at *5. Furthermore, the credibility finding "must contain specific reasons ... supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. "Put another way, an ALJ must assess subjective evidence in light of objective medical facts and diagnoses." Williams, 859 F.2d at 261.

### 1. Fibromyalgia

There is no dispute that plaintiff was diagnosed with fibromyalgia in March 2010, by Rheumatologist Dr. Crispin Abarientos, and was under continuing care through the date of last insured and beyond. Indeed, the diagnosis of fibromyalgia

was confirmed by the state agency consultative examiner Dr.
Guarnaccia [Tr. 357-59] and the state agency medical
consultants, Drs. Coughlin and Bernstein. [Tr. 370; 395].
"However, the 'mere diagnosis of fibromyalgia without a finding
as to the severity of symptoms and limitations does not mandate
a finding of disability.'" Crossman v. Astrue, 783 F. Supp. 2d
300, 305 (D. Conn. 2010) (quoting Rivers v. Astrue, 280 Fed.
Appx. 20, 22 (2d Cir. 2008) (summary order)).

     The issue here is the degree to which plaintiff's
fibromyalgia restricts her ability to perform basic work
activities. Specifically, plaintiff challenges the ALJ's
evaluation of her subjective complaints of pain. [Doc. #11-1 at
18-21]. The ALJ concluded that while "the claimant's medically
determinable impairments could reasonably be expected to cause
the alleged symptoms," plaintiff's "statements concerning the
intensity, persistence and limiting effects of these symptoms
are not entirely credible[.]" [Tr. 761]. The ALJ found that
plaintiff's fibromyalgia "supports the sedentary exertional
limitation" and "treatment notes reflect an improvement in the
claimant's pain with medication and treatment." [Tr. 764]. In
support, the ALJ provided a chronological assessment of the
treatment records from March 2010 through 2012. [Tr. 764-65].

     When plaintiff first began treatment with Dr. Abarientos on
March 18, 2010, he noted that plaintiff's musculoskeletal exam

"reveal[ed] no synovitis, has multiple tender points and normal muscle strength." [Tr. 381]. At the time of the initial consultation, plaintiff reported she was on Dilaudid (hydromorphone) for two months "but does not take away the pain completely; amitriptyline (Elavil) "which seems to help"; and Flexeril "intermittently for low back pain which she describes as localized to the lower back, nonradiating without any numbness or weakness in the lower extremity." [Tr. 379]. She also complained of right knee pain "which was presumed to be osteoarthritis of the knee."[4] Id. Dr. Abarientos prescribed Neurontin 300 mg. and advised plaintiff to taper her narcotics. [Tr. 381].

At a follow-up appointment on April 26, 2010, Dr. Abarientos noted that plaintiff was taking Neurontin 300 mg three times a day and reported that since she increased her dosage, she "noticed that she had difficulty finding her thoughts and words." [Tr. 374]. "She states that her generalized pain is somewhat better but she complains that her pelvic pain and abdominal pain remains unchanged." Id. "Her pain remains generalized but less" with poor sleep and energy. Id. Plaintiff reported she "could not tolerate her pelvic pain and went back to taking Dilaudid every six hours-after trying to stop the

---

[4] A bilateral knee x-ray on September 20, 2010, showed "no significant findings." [Tr. 728].

medication for little more than a week. Id. Because plaintiff reported side effects on Neurontin, the doctor decided not to increase the dosage. Id. He also switched her to Cymbalta 30 mg a day. Id.

Treatment notes from May 24, 2010, noted plaintiff was taking 60 mg of Cymbalta daily, Neurontin 300 mg twice a day and Dilaudid was increased to 4 mg every four to six hours because of persistent pain.[5] [Tr. 625]. Dr. Abarientos noted that since cutting back on her dose of Neurontin to twice daily, plaintiff was no longer reporting difficulty finding words. Id. Plaintiff reported that "she has very few good days and most of her days she is in a lot of pain mostly intra-abdominally and in her pelvis." Id. On August 11, 2010, plaintiff continued to report a "little bit" of improvement with her body aches and muscle pain "but her 'internal pain/abdominal pain' has not gotten better." [Tr. 1071]. On examination, Dr. Abarientos noted multiple tender points but no synovitis (inflammation of the synovial membrane) or muscle weakness. Id. Cymbalta was discontinued; plaintiff was taking Elavil 75 mg daily. Id. The doctor stated "I do not think I would be able to control her pain with Gabapentin [Neurontin] and antidepressants alone." [Tr. 1071-72]. Plaintiff was started

---

[5] The Court notes that the treatment records on April 26, and May 24, 2010, record different dosages for Cymbalta. [Tr. 374, 625]. While the dosages appear inconsistent it is not material to the issues raised.

on MS Contin 15 mg twice daily along with Dialaudid for breakthrough pain. [Tr. 1072].

On September 13, 2010, Dr. Abarientos noted that plaintiff stated she was "still having a hard time sleeping because of pain predominantly in her abdomen" and fatigue "especially when she goes out." [Tr. 1069]. On examination, no synovitis was noted. Id. The doctor increased plaintiff's MS Contin to 30 mg every eight hours.[6] Id. The results of an x-ray of the knee on September 20, 2010 were normal. [Tr. 728].

Plaintiff was next seen by Dr. Abarientos on January 20, 2011, when she reported that her "pain is under good control."[7] [Tr. 1067-68]. "Her main complaint is right hip pain which is worse with walking and bilateral knee pain which is more on the right."[8] [Tr. 1067]. Plaintiff reported she was depressed and asked about going back on antidepressants. Id. She also reported difficulty sleeping. Id. On examination, the doctor noted pain was a 6 to 7 out of 10; "[s]he is positive Tinel's and Phalen's

---

[6] Although treatment notes indicate that Dr. Abarientos wanted to see plaintiff for a follow-up appointment in two months, she did not return until January 20, 2011, when she reported her "pain was under good control." [Tr. 1067].
[7] Plaintiff was treated on four occasions in 2011 by Dr. Abarientos. [Tr. 1064-69].
[8] An x-ray of plaintiff's sacroiliac joints in July 2013 showed "mild degenerative change" and "no evidence of erosive change. No blastic or destructive lesions. No evident fractures." [Tr. 1421].

on the left side.[9] She has weak grip. No knee effusion but weak flexion. She has discomfort with hip abduction and hip flexion on the right." Id. Plaintiff's pain medications were continued without change and she was prescribed Cymbalta. [Tr. 1068]. An x-ray of the hips on January 24, 2011, was normal with "[n]o significant arthritis or degenerative changes."[10] [Tr. 732]. On June 20, 2011, plaintiff reported that "[s]he had a total abdominal hysterectomy and bilateral salpingo-oophorectomy in April for her chronic pelvic pain."[11] [Tr. 1066]. She reported that her "generalized pain is somewhat better and well controlled with the current pain regimen." Id. However, she complained of back and neck pain, non-radiating, located in the mid and lower back. Id. Energy was fair. Id. Medications and dosage were unchanged. Id. Plaintiff returned for follow-up on September 13, 2011, complaining of "a lot more pain in her back, knees and abdomen. She has been staying home and has not been

---

[9] As part of the physical examination for carpal tunnel symptom, a physician will perform Tinel's and Phalen's sign tests. http://webmed.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome. Plaintiff underwent left carpal tunnel release and left middle finger trigger release surgery in February 2011, without complication. [Tr. 617]. Her preoperative pain and numbness were resolved. Id.

[10] An x-ray of plaintiff's sacroiliac joints in July 2013 showed "mild degenerative change" and "no evidence of erosive change. No blastic or destructive lesions. No evident fractures." [Tr. 1421].

[11] A salpingo-oophorectomy is the "removal of the ovary and its fallopian tube." Stedman's Medical Dictionary, at 1567 (26th ed. 1995).

able to do house chores because of her pain." [Tr. 1065]. She also reported difficulty sleeping well but found that taking Flexeril at nights helps. Id. On examination, the doctor noted no synovitis. Id. Morphine ER dosage was increased to 45 mg three times a day. Id.  On December 8, 2011, Dr. Abarientos noted that plaintiff was "stable except for episodes of joint pain in between her long-acting morphine." [Tr. 1064]. She stated that Dialaudid 4 mg did not seem to control her pain. Id. "She complains of generalized pain which is more severe in her knee." [Tr. 1064]. Her morphine dosage was cut back to 30 mg three times daily; the dosage was unchanged for Cymbalta and Gabapentin. The doctor increased her Dilaudid to 8 mg three times a day. [Tr. 1064].

When plaintiff returned to Dr. Abarientos on March 8, 2012, she reported that she was off all pain medication and said "she is doing better since stopping her narcotics and her pain is generalized pain, especially the abdominal pain is better. She has since undergone a hysterectomy for endometriosis."[12] [Tr. 1286]. "Her only significant complaint is lower back pain, nonradiating and localized mainly to the lumbosacral area." Id. She also complained of bilateral knee pain which is worse when going up/down the stairs. Id. She was on Cymbalta but stopped

---

[12] The record contains treatment records for only one visit to Dr. Abarientos in 2012. [Tr. 1286-87].

her Gabapentin (Neurontin). Id. On examination the doctor noted
no synovitis, with mild tenderness on the medial join line and
tenderness with pressure on both patellas. Id. Plaintiff was
instructed on how to perform quadriceps strengthening exercises
and was advised on how to look up information on various
physical therapies regarding patellofemoral syndrome. Id. "If
she does not see any improvement with this conservative measure
I may refer her for a physical therapy evaluation." [Tr. 1287].
There are no further treatment records with Dr. Abarientos in
2012. Plaintiff's date last insured is September 30, 2012. [Tr.
144].

Additionally, on March 9, 2012, plaintiff also reported to
her primary care provider Dr. Novak that she felt "much better"
since discontinuing narcotic pain medication and that, since
starting high dose Vitamin D, her body aches were improved. [Tr.
1236; 765]. Plaintiff was "much more alert and compliant with
taking her medications." [Tr. 1236]. Dr. Novak noted
"arthralgias diffuse and myalgia but no joint swelling and no
joint stiffness. Her fibromyalgia initially flared with stopping
the narcotics but is now feeling better." Id. On examination,
the doctor noted "normal gait, no joint swelling seen and muscle
strength and tone were normal. There is no joint line tenderness
of the right knee." Id. He encouraged plaintiff to "start a
gradual exercise regime with walking on level ground." [Tr.

1240].

As previously noted, plaintiff did not seek treatment from her orthopedic provider in 2011 or 2012. [Tr. 762]. The record shows no treatment from February 2010 until April 2013. Similarly, in 2011 plaintiff treated with her Rheumatologist on four occasions [Tr. 1064-68]. By March 2012, plaintiff reported to Drs. Abarientos and Novak that she was off narcotic pain medication. There is one treatment record with Dr. Abarientos in 2012 through the date last insured. [Tr. 1286-87].

The Court finds no error in the ALJ's assessment of plaintiff's statements regarding the pain and functional limitations caused by her fibromyalgia. The ALJ supported this credibility finding with a detailed discussion of the medical evidence in this case as well as the treatment provider's record of plaintiff's complaints. As demonstrated above, substantial evidence supports the ALJ's conclusion that "treatment notes reflect an improvement in the claimant's pain with medication and treatment" and that her pain was "generally controlled with some exacerbations." [Tr. 764].

### 2.    Irritable Bowel Syndrome/Colitis

Similarly, the ALJ noted that the medical evidence of record documented a history of IBS which stabilized with treatment. [Tr. 763-64]. The ALJ summarized Dr. Opalacz's treatment records from August 2008 through August 2010 to

support this finding. [Tr. 763-64; 1030-34; 1185-86; 1207; 1278, 1280]. On December 17, 2012, plaintiff's gastroenterologist Dr. Opalacz noted that plaintiff "ambulates without difficulty" and was "in no acute distress." [Tr. 1426]. Results from a colonoscopy on December 23, 2012, were normal with "no evidence of active inflammatory bowel disease or collagenous or lymphocytic colitis." [Tr. 1278].

The Court finds no error in the ALJ's assessment of plaintiff's statements regarding the pain and functional limitations caused by irritable bowel syndrome and/or colitis and substantial evidence supports his conclusions.

In sum, the ALJ found that the plaintiff's claims of the severity of her symptoms and their impact on her functioning were not credible "to the extent they were inconsistent" with the medical evidence underlying the RFC determination. [Tr. 761]. The ALJ supported this credibility finding with a detailed discussion of the medical evidence in the case. [Tr. 760-68]. As set forth above, the objective medical evidence shows plaintiff had mild to moderate disc disease with a gap in treatment during the period in question. [Tr. 762, 1395]. "Diagnostic testing revealed primarily stable degenerative disc disease, with no neurological deficits and without progression from 2008-2010." [Tr. 766]. Treatment notes indicated that plaintiff was effectively treated for irritable bowel syndrome,

[Tr. 763-64] and fibromyalgia. [Tr. 764, 766]. Finally, the RFC assessment is supported by the state agency medical consultants and consultative examiner. [Tr. 357-59; 360-393].

The ALJ properly considered plaintiff's reported daily activities [Tr. 187-94, 204-11, 761, 767-68], the location, duration and intensity of her pain, her medical treatment and periods without treatment, and the effectiveness of medication to alleviate pain. [Tr. 760-68]. See 20 C.F.R.404.1529(c).

Due to the ALJ's direct observations of "a claimant's demeanor and other indicia of reliability[,]" the ALJ has a "unique ability" to make credibility determinations. Weather v. Astrue, 32 F. Supp. 3d 363, 370 (N.D.N.Y. 2012) (citations and quotation marks omitted); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("[T]he ALJ is in a better position [than other reviewers] to decide issues of credibility."). "Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator." Whiting v. Astrue, Civil Action No. 1:12CV274, 2013 WL 427171, at *6 (N.D.N.Y. Jan. 15, 2013). The ALJ made adequate findings, as set forth above, to allow meaningful review, and the Court finds no basis to disturb them. Accordingly, the Court finds no error in the ALJ's assessment of plaintiff's credibility and complaints of pain.

###### D.    Obesity Assessment

The ALJ found that plaintiff's obesity was a severe medical impairment. [Tr. 757]. Plaintiff argues that the ALJ's failure to discuss the effects of her obesity on the severity of her diabetes, hypercholesterolemia, knee pain and dysfunction, lumbar derangement, gastrointestinal conditions and asthma in determining her ability to work was error. [Doc. #11-1 at 22 (citing SSR 02-1p, 2002 WL 34686281 (S.S.A. Sept. 12, 2002); Crossman, 783 F. Supp. 2d at 309-10 ("the ALJ must evaluate obesity in conjunction with claimant's residual functional capacity by assessing the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.")]; see also Willoughby v. Comm'r, 332 F. Supp. 2d 542, 549 (W.D.N.Y. 2004) (finding error where the ALJ failed to consider the effects of obesity on the severity of claimant's impairments, RFC, and ability to do basic work activities); Hogan v. Astrue, 491 F. Supp. 2d 347, 355 (W.D.N.Y. 2007) ("[T]he ALJ was required to consider the effect that plaintiff's obesity had on the severity of her impairments and her residual functional capacity.").  The Court disagrees.

The ALJ specifically evaluated plaintiff's obesity in accordance with the requirements of SSR 02-1p, "as her weight could affect the pressure on her spine and weight-bearing

joints." [Tr. 765]. The ALJ found that plaintiff's "weight did

not decrease or increase substantially for the adjudicatory

period," concluding that the "overall evidence does not support

greater limitations than a sedentary residual functional

capacity." [Tr. 765]. The ALJ specifically considered the

"effect of claimant's obesity as a factor which may increase the

severity of coexisting or related impairments." [Tr. 759].

The ALJ's conclusion is supported by substantial evidence

of record.  Objective medical evidence supports the ALJ's

assessment of functional loss, regardless of the impairment,

> Examination on February 5, 2010, revealed ambulation
> with a normal gait, intact, 5/5 motor strength in all
> muscle groups, and intact reflexes in the upper and
> lower extremities. Although straight leg raising
> produced low back pain, the claimant demonstrated no
> atrophy or sensory deficits in the upper or lower
> extremities. Forward flexion and extension of the
> lumbar spine were limited by pain.

[Tr. 760]. The ALJ correctly noted that "these clinical findings

remained consistent throughout the record."[13] Id.; see Tr. 1038-

---

[13]An MRI on April 22, 2013, revealed a disc herniation at L5-S1.
[Tr. 1395-96]. The record from Middlesex Orthopedic Surgeons,
P.C., dated April 10, 2013, states, "We have not seen her in
approximately over three years. She states about a month ago she
started having low back pain and right leg pain." [Tr. 1395
(emphasis added)]. The provider noted that plaintiff ambulated
without an assistive device, "motor strength testing C5-T1, L1-
S-1, 5/5 grade strength all groups," reflexes were 2+ in both
upper and lower extremities, no long tract signs or pathological
reflexes, straight leg raising was positive on the left hand
side, no atrophy or sensory deficits was noted in the upper or
lower extremities. Id. "Range of motion: forward flexes to about
90 degrees, extension 10 degrees, axial rotation 5 degrees

39 (8/10/10 noting that plaintiff ambulates without difficulty, normal gait, normal station, short term and long term memory intact); Tr. 1269 (4/21/11 "review of systems are normal"); Tr. 1261 (11/10/11 "normal gait, no joint swelling seen and muscle strength and tone were normal;" "[s]ensation and strength [are] intact in both upper extremities;" "the motor exam was normal"); Tr. 1239 (3/9/12 noting normal musculoskeletal and neurological exam, "normal gait"); Tr. 1231 (9/18/12 same);  Tr. 1241 (6/27/12 same); Tr. 1256 (8/12/11 same); Tr. 1426 (12/17/12 "ambulates without difficulty, in no acute distress"); Tr. 1339 (4/24/13 "denies muscle pain. The patient is currently asymptomatic;" glycemic control and lipids remain at goal; asthma is stable, "motor exam was normal"); Tr. 1326-27 (10/10/13  "normal gait, no joint swelling seen and muscle strength and tone are normal"; "motor exam was normal"; "no focal findings on neurologic" "not feeling poorly (malaise) and not feeling tired (fatigue)"); Tr. 1331-32 (7/5/13 same adding, "no known diabetic complication ... currently asymptomatic").

The ALJ correctly noted that, overall, plaintiff's "weight did not decrease or increase substantially for the adjudicatory period. [Tr. 765]. During the period under review, plaintiff's

_____

bilaterally." Id. Plaintiff's date last insured is September 30, 2012. [Tr. 144].

BMI was high, ranging from 32.6 to 37, and was classified as obese. [Stip. of Fact, Doc. #15 n. 23, 25, 27, 30, 32, 35, 37, 41, 46, 56, 66, 78, 84, 90, 92, 95, 104]. However, the mere fact that a claimant is obese is not enough to make this condition severe nor is it evidence of functional loss.

> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

SSR 02-1p, 2002 WL 34686281, at *2 (S.S.A. Sept. 12, 2002). "At step[] four, ... the ALJ must evaluate obesity in conjunction with claimant's residual functional capacity by assessing the "effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Crossman, 783 F. Supp. 2d at 309-10 (citations omitted). Plaintiff has failed to sustain her burden of showing at step four that her asserted obesity "significantly limited [her] physical ... ability to do basic work activities[.]" 20 C.F.R. §§404.1520(c), 416.920(c). The Court has reviewed plaintiff's arguments and finds substantial evidence of record to support the ALJ's step four finding as to obesity.

### E.    Medical Opinions

Plaintiff raises several arguments challenging the ALJ's

assessment of plaintiff's treating physicians, state agency reviewing physicians and state agency consultative examiner. [Doc. #11-1 at 22-26].

Plaintiff first isolates two statements in the ALJ's fifteen page opinion, challenging the consideration of her medical records and the assignment of weight to the treating physician's opinions. She argues that the

> ALJ has stated that "the treating providers, Dr. Bash, Dr. Sohn, and Dr. O'Donnell, prescribed only conservative treatment for the claimant's back and knee pain, which included physical therapy, water therapy, and epidural injections" (TR at 766). He goes on to state that "Great weight was accorded the opinions of the claimant's treating physicians of continued conservative treatment due to their area of expertise, the nature of the treating relationship, and the longitudinal treatment history" (TR at 767). The meaning is opaque. It is particularly opaque when one considers that the ALJ never so much as mentioned Dr. Daniel Novak in his decision, facially ignored over two years worth of medical records from Dr. Opalacz, and never meaningfully evaluated Dr. Abarientos's often stated diagnosis of chronic pain syndrome and fibromyalgia.

[Doc. #11-1 at 22-23].

Plaintiff claims that the ALJ failed to mention Primary Care Physician Dr. Daniel Novak's treatment in his ruling but offers no further development of this argument or citation to Dr. Novak's treatment records. [Doc. #11-1 at 22]. However, the ALJ referenced a March 9, 2012, treatment record from Dr. Novak at page 765 of his ruling, noting that plaintiff

reported feeling 'much better' off her narcotic pain

> medication. She further stated that her body aches had
> improved since starting Vitamin D. Examinations
> revealed diffuse arthralgias and myalgias, but no
> joint swelling or stiffness. The claimant's muscle
> strength and tone were normal, and her gain was
> normal. Her right knee demonstrated no joint line
> tenderness, a negative Lachman's sign and a negative
> McMurray's sign. Sensory examination was normal to
> light touch.

[Tr. 765; 1236-40]. Dr. Novak treated plaintiff for, among other things, diabetes, hypercholesterolemia, asthma, migraine headaches, and depression, as well as respiratory infections. The ALJ also referenced other primary care treatment records at pages 757-58 and 763 of his opinion. As noted earlier in this opinion, the Court finds no error in the ALJ's step three finding that plaintiff's diabetes is a nonsevere condition. Moreover, there is substantial evidence of record showing that her diabetes, hypercholesterolemia, and asthma stabilizes when plaintiff is compliant with diet and/or medication. [Tr. 1095, 1110-11, 1112-13, 1221, 1226, 1229, 1231, 1234, 1236]. The Court finds no error on this determination.

To the extent that plaintiff reasserts a claim of error with regard to the ALJ's consideration of Gastroenterologist Dr. Opalacz's treatment records, the Court addressed this issue earlier in this opinion and finds no error.

Similarly, the Court addressed plaintiff's claim of error as to the ALJ's evaluation of Dr. Abarientos's treatment records earlier in this opinion and finds no error.

Plaintiff next argues that "[i]t is noteworthy that the ALJ never sought a functional assessment from Dr. Abarientos." [Doc. #11-1 at 23 (citing Hallett v. Astrue, Civil Action No. 3:11-cv-1181(VLB), 2012 WL 4371241, *7 (D. Conn. Sept. 24, 2012))]. Here, the ALJ accorded " "great weight" to the opinions of plaintiff's "treating physicians of continued conservative treatment due to their areas of expertise, the nature of the treating relationship, and the longitudinal treatment history." [Tr. 767]. Plaintiff does not assert a claim that the ALJ failed to follow the treating physician rule. Rather, plaintiff seems to argue that the ALJ failed to adequately develop the record because he "never sought a functional assessment from Dr. Abarientos." [Doc. 11-1 at 23]. The Court disagrees. As set forth earlier in this opinion, substantial evidence supports the ALJ's finding that "treatment notes reflect an improvement in the claimant's pain with medication and treatment" and "reflected no greater limitations than a sedentary exertional ability." [Tr. 764-65 (reviewing Dr. Abariento's treatment records)]. This case is distinguishable from Hallett v. Astrue because in Hallett, "it was not clear from the record whether the ALJ properly credited the treating physician's findings," noting that claimant provided evidence from two treating sources, his physical therapist and orthopedist, that "he was limited and unresponsive" to treatment and these findings were

confirmed by an independent medical examiner and consultative examiner. Hallett, 2012 WL 4371241, at *7-8; see also Peed v. Sullivan, 778 F. Supp. 1241, 1245-46 (E.D.N.Y. 1991) (remanded for failure to follow treating physician's rule and failure to develop the record). Here, the record contains the treatment records of Dr. Aberientos. [Tr. 627, 1064-78; see Doc. #15 Stip. of Facts]. Defendant correctly states that under the agency's regulations, "the absence of a statement about what the individual can still do despite her impairments does not make the treating source's report incomplete." 20 C.F.R. §404.1513(b)(6). The Court finds no error on this claim.

Plaintiff next challenges the ALJ's assignment of "great weight" to the state agency reviewing physicians, Dr. Barbara Coughlin and Dr. Abraham Bernstein, contending that "[i]t may well be that Drs. Coughlin and Bernstein, are "highly qualified" physicians (TR at 767) but their qualifications have scant relevance to the facts of this case."[14] [Doc. #11-1 at 25]. Dr. Coughlin is a Pediatrician. [Tr. 48]. Plaintiff contends that "[t]o afford Dr. Coughlin's opinions great weight due to

---

[14] Both doctors opined that plaintiff was capable of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds, standing and/or walking for about 6 hours in an 8-hour workday; sitting (with normal breaks) for 6 hours in an 8-hour workday; occasionally climbing ramps/stairs, stooping, kneeling, crouching, crawling; frequently balancing, and never climbing ladders/ropes/scaffolds. [Tr. 367, 392].

her specialty in pediatrics borders on the absurd." [Doc. #11-1 at 24]. Dr. Bernstein's specialty is in internal medicine, which plaintiff contends "by virtue of his specialty" is not "entitled to any particular weight." Id.  Defendant correctly states that both Coughlin and Bernstein are medical doctors and "[s]tate agency medical consultants are highly qualified physicians, who are experts in Social Security disability evaluation." [Doc. #13-1 at 10 (citing 20 C.F.R. §404.1527(e)(2); SSR 96-6p)]. Plaintiff's case law is distinguishable. This is not a situation where the treating physician's opinions were accorded no weight and the opinions of the non-examining state agency reviewing physicians were relied on by the ALJ as substantial evidence to override the treating physicians' opinions. See Doc. #11-1 at 24-25 (quoting Gayheart v. Comm'r of Social Security, 710 F.3d 365, 377 (6th Cir. 2013) and Minsky v Apfel, 65 F. Supp. 2d 124, 139 (E.D.N.Y. 1999). Additionally, the ALJ here provided a review of the treatment records and medical evidence from the treating physicians that supported his findings in according "great weight" to their opinions. [Tr. 767]. Accordingly, the Court finds no error on this claim.

Finally, plaintiff addressed the ALJ's assessment of "significant weight" to the opinion of state agency consultative examiner Dr. Joseph Guarnaccia. [Doc. #11-1 at 24-25]. She argues that the "ALJ does not inform, in his decision, of how an

individual with limitation on prolonged sitting can be expected

to sit for at least two-thirds of a work day (an incident of

work at the sedentary level of exertion)." [Doc. #11-1 at 25-

26].  However, Dr. Guarnaccia found that,

> plaintiff states that she is unable to work or sit for
> prolonged periods of time. On examination, she
> actually has full strength in all four extremities,
> though she does have a <u>mildly</u> antalgic gait with <u>some</u>
> tenderness over multiple joints. Per history, the
> patient will have <u>some limitations</u> on standing,
> walking, sitting, or carrying objects for prolonged
> periods of time.

[Tr. 359 (emphasis added)].

The parties correctly point out that Dr. Guarnaccia did not

specify the amount of time plaintiff could perform these tasks.

Nevertheless, this does not render Dr. Guarnaccia's opinion

inconsistent with the performance of sedentary work. <u>See</u>

<u>Halloran v. Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004) ("The

regulations do not mandate the presumption that all sedentary

jobs in the United States require the worker to sit without

moving for six hours, trapped like a seat-belted passenger in

the center seat on a transcontinental flight."). Defendant also

points out that the ALJ assessed "great weight" to Dr.

Guarnaccia's opinion, not "controlling weight." [Tr. 767]. As

set forth below, the ALJ identified the evidence he relied on in

assessing plaintiff's RFC. [Tr. 769].  Accordingly, this Court

finds no error in the ALJ's assessment of the consultative examiner's opinion.

### F.   RFC Assessment

In his decision, the ALJ concluded that plaintiff had the RFC to "perform a full range of sedentary work as defined in 20 C.F.R. §404.1567(a)." [Tr. 760]. The regulations dictate the physical exertion requirements of sedentary work:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a), 416.967(a). SSR 83-10 further notes that, "'[o]ccasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).

A claimant's RFC is "the most [s]he can still do despite h[er] limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). "The RFC determination is reserved for the commissioner. See 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2)." Walker v. Astrue, No. 08-CV-0828(A)(M), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010). "However, an ALJ's RFC assessment is a medical determination that must be based on probative evidence of record. Accordingly, an ALJ may not substitute his own judgment

for competent medical opinion." Id. (internal citations and quotation marks omitted).

Despite plaintiff's arguments to the contrary, the ALJ's RFC determination is supported by substantial evidence of record. Specifically, the ALJ conducted a detailed review of the relevant evidence of record, including plaintiff's testimony, activities of daily living reports, treatment notes from plaintiff's medical providers, and the medical opinions of record. [Tr. 760-68]. As previously discussed, the ALJ permissibly placed "great weight" on the opinions of the state reviewing non-examining physicians Drs. Coughlin and Bernstein [Tr. 366-70; 391-95; 767] and assigned the opinion of state agency consultative examiner Dr. Guarnaccia "significant weight." [Tr. 767-68]. The limitations ascribed by their respective physical RFC determinations support the ALJ's RFC findings. See discussion of medical evidence, supra. The ALJ appropriately relied on the opinions of state agency physicians in his assessment of plaintiff's RFC and their opinions provide substantial evidence to support the ALJ's decision. Frye ex rel A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012) (finding it appropriate for the ALJ to rely on a state agency physician's opinion where it was the only opinion on the issue); 20 C.F.R. §404.1527(e)(2)(i) (directing ALJ's to consider the opinion evidence of state agency medical consultants); SSR 96-6p, 1996

42

WL 374180, *4 (S.S.A. July 2, 1996) ("the administrative law
judge or Appeals Council must consider and evaluate any
assessment of the individual's RFC by a State agency medical or
psychological consultant."). Other substantial evidence of
record, recited in the Court's discussion above, also supports
the ALJ's findings. Id.

    The ALJ specifically considered plaintiff's testimony
which he permissibly found "not entirely credible," including
her statements to health providers, activities of daily living
and gaps in treatment. [Tr. 761; 760-68].

    As previously stated, the ALJ's decision reflects that he
did in fact consider plaintiff's allegations of pain, their
consistency or inconsistency with the objective medical
evidence, and how such complaints of pain generally did not
result in functional limitations. See, e.g., Tr. 764-65
(summarizing records showing pain "generally controlled" with
medication and treatment); Tr. 761-63 (summarizing medical
records reporting plaintiff's complaints of, and treatment for,
back, knee, hip and neck pain); Tr. 763-64 (summarizing medical
records reporting irritable bowel syndrome stabilized with
treatment); Tr. 764-66 (summarizing medical records for
fibromyalgia treatment for pain). He further conducted an
extensive credibility analysis and permissibly found plaintiff's
claims of pain "not entirely credible." See Tr. 766-68.

Moreover, the ALJ indicated the evidence he relied on in assessing plaintiff's RFC. [Tr. 786].

As noted earlier, the Court's role in reviewing a disability determination is not to make its own assessment of the plaintiff's capabilities; it is to review the ALJ's decision for any reversible error. "[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B., 523 F. App'x at 59 (citations omitted). For the reasons stated, the Court finds no error in the ALJ's RFC assessment, which is supported by substantial evidence of record.

### G.   Past Relevant Work as a Loan Officer

Finally, plaintiff raises several claims of error in the ALJ's handling of the Vocational Expert's testimony. [Doc. #11-1 at 26-29]. At step four of the sequential evaluation, the ALJ considered plaintiff's past relevant work as a loan officer in a financial institution from 2003 through 2006. [Tr. 149, 751]. The ALJ noted that plaintiff reported that this job involved sitting for six hours, standing for two hours, walking for two hours, lifting no more than twenty pounds and frequently lifting less than ten pounds for short distances. [Tr. 170-71; 768]. The ALJ also considered the testimony of the vocational expert, who testified at the May 9, 2011 hearing that plaintiff's past

relevant work as a loan officer[15] was classified as skilled work performed at the sedentary exertional level. Defendant correctly states that, "[b]ecause plaintiff retained the RFC to perform the full range of sedentary work through September 30, 2012, the ALJ properly found that [she] was capable of performing her past relevant work as a loan officer through September 30, 2012," her date last insured. [Doc. #13-1 at 12 (citing Tr. 769)].

In determining whether plaintiff could return to her past relevant work, the ALJ considered plaintiff's description of the exertional demands of her work as a loan officer as she performed it, the vocational expert's testimony that the position is considered skilled sedentary work and the medical evidence establishing how her impairments might limit her ability to meet the physical requirements of the work. [Tr. 760-769]; see SSR 82-62, 1982 WL 31386, at *3-4 (S.S.A. Jan. 1, 1982); see DOT §186.267-018 at 140 (4th ed. Text revision 1991) (Loan Officer (financial; insurance)). As set forth above, the Court finds that the ALJ's determination that plaintiff retained the RFC to perform sedentary work was supported by substantial evidence. Similarly, the ALJ's finding that plaintiff could

---

[15] The VE testified that the position of loan officer is listed "as such" under the Dictionary of Occupational Titles. [Tr. 43]. Plaintiff confirmed that the position of loan officer is listed in the DOT at Section 186.267-018. [Doc. #11-1 at 27; see DOT §186.267-018 at 140 (4th ed. Text revision 1991) (Loan Officer (financial; insurance)).

return to her past relevant work as a financial officer is supported by substantial evidence. Thus, the ALJ's inquiry ended at step four. The ALJ did not need to inquire of the vocational expert whether an individual of plaintiff's age, education, experience and RFC for sedentary work could perform her past relevant work as a loan officer. "When the ALJ determines that the claimant is able to return to her past relevant work, the services of a vocational expert are not necessary." Carolyn A. Kubitscheck, Social Security Disability Law and Procedure in Federal Court §3:39, at 265 (2010) (citing Miles v Barnhart, 374 F.3d 694, 700 (8th Cir. 2004; Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)). "Under the five-step analysis of social security cases, when a claimant can perform his past relevant work, he is not disabled. Once this decision is made ... the services of a vocational expert are not necessary." Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996) (internal citations omitted). Because the Court found that the ALJ's determination of the extent of plaintiff's disability is supported by substantial evidence, the Court likewise concludes that no vocational expert was required.

## VI. CONCLUSION

For the reasons stated, plaintiff's Motion for Reversal or Remand **[Doc. #11]** is **DENIED**. Defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #13]** is

**GRANTED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude further review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrate Judges; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989) (per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to assign this case to U.S. District Judge Warren W. Eginton, who issued the prior remand, for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. See Fed. R. Civ. P. 72(b)(3); D. Conn. L. Civ. R. 72.1(C)(1) for Magistrate Judges.

SO ORDERED at Bridgeport this 26th day of October 2016.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE